# FEDERAL PUBLIC DEFENDER

MIDDLE DISTRICT OF PENNSYLVANIA
100 CHESTNUT STREET, SUITE 306
HARRISBURG, PENNSYLVANIA 17101-2540
TELEPHONE: (717) 782-2237
FAX: (717) 782-3881

**FEDERAL PUBLIC DEFENDER**
JAMES V. WADE

**ASSISTANT FEDERAL DEFENDERS**
DANIEL I. SIEGEL
LORI J. ULRICH
THOMAS A. THORNTON

March 9, 2001

William Pool
United States Probation Officer
Federal Building
Room 720, 7th Floor
Harrisburg, PA  17108

RE:  *United States v. R. Steven Stackpole*
     *1:00-CR-00046-01*

Dear Mr. Pool:

I have reviewed the Presentence Report with Mr. Stackpole and the following are our objections, corrections, and additions to that report.

*Paragraph 6*

Mr. Stackpole understands that the information in the offense conduct section of the Presentence Report has been provided by the prosecution. As a general reply to the offense conduct set out in the Presentence Report Mr. Stackpole would note that he did not begin this venture with the intention to commit a fraud. He intended to make money through a financial program which he, seven banks, several investment houses and numerous lawyers thought was a sound vehicle. Barbara Seifert, of Nazareth National Bank, testified on the stand that she believed that the program presented by Mr. Stackpole was the best she had seen in her years as a trust officer. Mr. Stackpole asserted at trial, and continues to assert now, that he intended to make money through a financial formula he had researched and developed with the help of accountants and lawyers. Mr. Stackpole's belief in the soundness of his financial formula is justified because several entities, including U.S.Bancorp, are currently following his "insurance and investment" formula and making profits.

*Paragraph 7*

As an addition, Mr. Stackpole would note that the $5,000 that he loaned to Gavin Green was secured by a $50,000 mortgage on Gavin Green's property. That mortgage was released when Gavin Green paid back the $5,000 which was loaned to him by Mr. Stackpole.

Mr. William Pool
PSR Objections for R. Steven Stackpole
March 9, 2001
Page 3

transactions. This insurance was in place for each investor and the government did not present any evidence at trial to indicate that SIPC insurance was not available to the investors. In fact, it is possible that the investors who lost money may now proceed against the SIPC insurance or other insurance carried by Maidstone Financial. The ability of the investors to proceed against the insurance held by Maidstone Financial or the SIPC is significantly increased by the fact that Marshal Bernstein, the chief financial officer of Maidstone, has just been indicted in a stock manipulation scheme which involved the very stocks he sold to Mr. Stackpole (see attachment). Those stocks were "pumped and dumped" into Mr. Stackpole's account which resulted in gains for Mr. Bernstein which were clearly illegal. Consequently, the investors should be able to proceed against Maidstone and SIPC. The government did not present any evidence at trial that such recompense was not available. The funeral directors are currently suing the bank and others for return of their funds.

It should further be noted that there were no "front load or back load" charges. If the program had been allowed to operate for 5 years, without the failures of Maidstone and Marshal Bernstein, then it was Mr. Stackpole's intention to return the money plus the interest accrued without any commissions being deducted. Mr. Stackpole's accountant-certified financial program supported such a forecast. However, the program was not allowed to run for 5 years and Marshal Bernstein seems to have stolen a significant amount of the funds.

*Paragraph 15*

It should be noted that Mr. D'Ambola received a return of his money from Nazareth National Bank not EAIT or Steven Stackpole. The fact that his money was returned from Nazareth National Bank and not any form of EA or EAIT is of significant importance. The offense conduct has failed to note that the funeral directors and individual investors brought into the plan by Commonwealth Partnership Trust had a trust agreement with Nazareth National Bank. They did not have any agreement with Steven Stackpole. There was no trust agreement between the individual investors and EAIT. According to the trust documents, Nazareth National Bank took the money in trust and then used their institutional discretion to invest with EAIT.

This fact is underscored by the letters of the funeral directors which were attached to the Presentence Report. The funeral directors also indicate that their funds were put into trust with Nazareth National Bank. Nazareth National Bank then had an agreement with EAIT to do the investments. Therefore, the trust was with Nazareth National Bank and not Steven Stackpole or EAIT. Consequently, Mr. D'Amboa got his money back from Nazareth, not EAIT.

Mr. William Pool
PSR Objections for R. Steven Stackpole
March 9, 2001
Page 4

*Paragraph 17*

    The Presentence Report places great emphasis on the lack of licensing. The Presentence Report erroneously relies on the government's assertion that there was some reason for Mr. Stackpole to disclose his prior bankruptcy, civil suit and indictment. There was no legal requirement that Mr. Stackpole disclose any of those previous difficulties. The government did not provide any testimony from any regulatory agency at trial that would indicate that there are such disclosure requirements. Furthermore, it should be noted that Mr. Stackpole did not sell to any individual or funeral home in Pennsylvania and therefore would not have required a Pennsylvania license. However, Commonwealth Partnership Trust did sell in Pennsylvania. Commonwealth Partnership Trust was operated through the Gingrich Insurance Agency which was licensed.

*Paragraph 20*

    As an addition, Mr. Stackpole would again note that the return of the funds was guaranteed with interest **after** a period of 5 years. There was no guarantee that the money would not be initially used for costs and set-up. The "guarantee" was that the final payment would occur after 5 years of the program and the payout would reflect a 12% per year gain.

*Paragraph 21*

    As an addition, Steven Stackpole would note that the program that he developed is a sound investment vehicle which is still being used to this day. United States Bancorp is running the very same "insurance and investment" program which Mr. Stackpole attempted to institute with many of the same clients. If Mr. Stackpole's program was no more than "a scheme" then Ms. Seifert would not have praised it during trial and it would not be producing profits for a different bank at this time.

    Steven Stackpole also asks that the Presentence Report note that he never personally met with any funeral directors. Also the trust for the funeral homes was with Nazareth National Bank not with Steven Stackpole or EAIT. The "finder's fees" were negotiated by the bank with Commonwealth Partnership Trust (CPT). The money for the "finder's fees" came out of CPT's money and did not involve Steven Stackpole

*Paragraph 23*

    Once more it should be noted that there was no legal requirement that Mr. Stackpole notify Nazareth National Bank or anyone else regarding his prior difficulties. The government did not present any evidence at trial that such notification was required by any law or regulation.

Mr. William Pool
PSR Objections for R. Steven Stackpole
March 9, 2001
Page 5

*Paragraph 24*

Steven Stackpole objects because James Butler is named by the Presentence Report as part of the EAIT "scam". In fact, Mr. Butler was not associated with Steven Stackpole except through his job at Nazareth National Bank. At first blush, Mr. Butler would seem to be a victim of the fraud who learned to profit from his failures. However, as it turned out, Mr. Butler was running his own scheme without the knowledge of EAIT or Steven Stackpole. In fact, Mr. Butler was running his own scheme without the knowledge of the bank that was employing him. Mr. Butler lied to everyone who interviewed him and covered up his failures with forgeries.

The Presentence Report has omitted any discussion of James Butler's actual activities. Mr. Butler forged documents which he used to justify his actions before the Pennsylvania Securities Exchange Commission. Mr. Butler lied to superiors at Nazareth National Bank and extorted money from Commonwealth Partnership Trust. Mr. Butler was his own personal crime wave. At trial, Mr. Butler continued his prevarications.

There was no conspiracy or other connections between the actions of James Butler and the actions of Steven Stackpole. Mr. Butler was trying to further his career and steal as much money from Steven Stackpole, CPT, Nazareth National Bank and anyone else he could.

*Paragraph 26*

Steven Stackpole objects because the Presentence Report has inaccurately described the insurance portion of his program. From his first contacts with Nazareth National Bank Steven Stackpole's plan involved obtaining insurance on the lives of the Pre-Need funeral customers. Mr. Stackpole's plan of investment only worked if insurance was underwritten on the lives of the Pre-Need customers. At trial, every witness testified that insurance on the Pre-Need customers was part of the plan from the very beginning.

Mr. Stackpole also objects because the Presentence Report indicates that Nazareth National Bank enlisted the help of Phillip White. In fact, Steven Stackpole introduced Phillip White and North Atlantic Services to Nazareth National Bank. Phillip White was a long time family friend of Gavin Green. Therefore, it is clear that Phillip White did not come onto the scene as a result of Nazareth National Bank finding him. Phillip White was an integral part of the insurance portion of Mr. Stackpole's plan and it was always contemplated that insurance would be purchased on the Pre-Need customers.

Mr. William Pool
PSR Objections for R. Steven Stackpole
March 9, 2001
Page 6

*Paragraphs 32 and 35*

Steven Stackpole objects to the Presentence Report finding that checks were issued in the amount of $9,000 for the purpose of evading reporting requirements. In fact, as noted by witnesses at trial, all of the $9,000 checks were followed up by IRS 1099 forms and put on the W-2s of the recipients of the checks. All of the checks were documented and logged in by Scott Stackpole. There was no attempt to evade or hide these payments.

*Paragraph 36*

Steven Stackpole objects because the Presentence Report indicates that money was misspent on "other investments like the Golden Lady Topless Dance Club in the Bronx and Gavin Green's brother's two-bedroom condo in New Jersey." In fact, these two investments were legitimate and authorized by the incorporation documents of EAIT. The club formerly known as the Golden Lady is operating today. EAIT would have made money on that investment if not for the mismanagement of Gavin Green.

It must be recalled that the investors gave their money to Nazareth National Bank which then discretionarily gave it to EAIT for investment. There was no directed trust. The exact forgeries foisted upon the Pennsylvania Securities and Exchange Commission by James Butler were an attempt to coverup this problem.

James Butler realized that Nazareth National Bank was on the hook for all of the funds invested through EAIT because it was a discretionary trust. James Butler forged numerous and significant documents. The Presentence Report does not note these significant and unscrupulous actions which changed the trust from discretionary to directed. If the agreement between Nazareth National Bank and EAIT had **directed** EAIT to invest the money with Maidstone, then there could be an argument that the money was misspent. However, Nazareth National Bank had a discretionary trust with EAIT. This meant that EAIT had discretion as to how and where to invest the money. The "Golden Lady" and the condo were legitimate speculative investments. Nazareth National Bank had given complete discretion to EAIT regarding how, when and where any funds were invested. The forgeries and lies of James Butler were an attempt to cover up this incredible failure by Nazareth. This failure occurred even though Nazareth's attorneys approved the discretionary trust.

Mr. William Pool
PSR Objections for R. Steven Stackpole
March 9, 2001
Page 7

*Paragraph 39*

Steven Stackpole objects to the inflammatory verbiage provided by the prosecutor in this paragraph. There was no pressure put on any individual to invest money in these plans. If pressure was put on it was put on by people outside of EAIT or Commonwealth Partnership Trust. If there was any pressure it was exerted by individuals who should have been prosecuted but enjoyed the benefits of prosecutorial selection. These investments were not "hawked" and there is no support for the statement that the final sentence of that paragraph.

*Paragraph 40*

Steven Stackpole objects to the inclusion of James Butler as a co-conspirator. Mr. Stackpole did not have any illegal arrangements with James Butler. The only illegal arrangements that involved James Butler was as a result his shakedown of Commonwealth Partnership Trust for an illegal kick back. Mr. Stackpole was not involved in Mr. Butler's sideshow attempts to gain more money. In essence, James Butler was running his own scheme trying to make money off the various participants of this plan.

*Paragraph 42*

Steven Stackpole objects to the perjury allegation in this paragraph and requests that a hearing be held on any perjury enhancement that he might possibly face.

*Paragraph 45*

Steven Stackpole continues his objection to any increase for obstruction of justice. This paragraph incorrectly states that "Steven Stackpole indicated that the issuance of these $9,000.00 checks was a mere coincidence." In fact, Steven Stackpole testified that Joseph Cordo had requested the checks in such a manner in conversations with Scott Stackpole. Steven Stackpole told Scott Stackpole to issue the checks in anyway which Mr. Cordo requested.

It is significant that the indictment does not support the perjury enhancement sought by the government. In paragraph 4 of Count 13, the indictment charges "Joseph Cordo had EAIT structure payments. . .". Steven Stackpole only told Scott Stackpole to do whatever Cordo requested.

Furthermore, there was absolutely no testimony at trial that Steven Stackpole told Scott Stackpole that he was to issue these checks in $9,000 amounts to avoid cash transaction reporting requirements. Therefore, there is no basis for the perjury claim of the government. As noted previously, Steven Stackpole requests a hearing on this enhancement.

Mr. William Pool
PSR Objections for R. Steven Stackpole
March 9, 2001
Page 8

*Paragraph 54*

Steven Stackpole objects to the victim related adjustment of 2-levels and requests a hearing. Each of the victims signed a disclosure agreement and cash account agreement. These agreements notify each and every investor that there is a possibility of loss. Therefore, the investor's individual choice to proceed despite that possibility of loss negates any vulnerable victim increase. Furthermore, it should be noted that the funeral directors certainly do not fit into any category of vulnerable victim as they are very sophisticated investors who were looking to make a huge return on their money.

*Paragraph 55*

Steven Stackpole objects to the adjustment for role in the offense and requests a hearing. Mr. Stackpole objects because the Presentence Report indicates that he was the organizer or leader of a criminal activity which involved five other criminal participants. The participants listed include James Butler. As previously explained in these objections, James Butler was not part of any conspiracy or anything else directed or organized by Mr. Stackpole. James Butler was a loose cannon. In fact, Mr. Stackpole was a victim of James Butler's illegal acts. Therefore, there should be no increase for adjustment of role.

*Paragraph 56*

Steven Stackpole objects because the Presentence Report has indicated a 2-level increase for abuse of position of trust. Mr. Stackpole did not tell anyone who lost money that he was an investment broker. Mr. Stackpole merely operated as the trustee of a discretionary trust. Mr. Stackpole entrusted his investments to Marshal Bernstein of Maidstone Financial. Marshal Bernstein has recently been indicted by the federal government for "pumping and dumping" the very stocks that he sold to Steven Stackpole. EAIT lost a significant amount of money as a result of the actions of Marshal Bernstein.

It must again be noted that Nazareth National Bank served as the directed trustee of the funeral directors' funds. The funeral directors' letters themselves indicate that they believe Nazareth National Bank to be the trustee. This was backed up by the signing of a discretionary trust. Steven Stackpole was, at best, a discretionary trustee who failed. He did not abuse a position of trust. Furthermore, it would not appear that this crime was "difficult to detect" because of the voluminous paper trail that was purposefully generated by Commonwealth Partnership Trust and Nazareth National Bank.

Mr. William Pool
PSR Objections for R. Steven Stackpole
March 9, 2001
Page 9

*Paragraph 73*

As an addition, Steven Stackpole would note that he is currently scheduled for court on March 16, 2001 and expects to have his New Jersey difficulties resolved at that time.

*Paragraph 77*

As a correction, Mr. Stackpole would note that his wife's maiden name was Levin and that they were married for 32 years.

*Paragraph 78*

As an addition, Mr. Stackpole would note that he has now developed arthritis and other back problems.

*Paragraph 81*

As a correction, Mr. Stackpole notes that he attended Ricker College for one year and then went to the University of Maine in Portland. Thereafter, he went to Portland University in Maine.

*Paragraph 82*

As an addition, Mr. Stackpole would note that he has held a series 6 license. That license was later abandoned because Guardian Insurance no longer participated in those type of investments. As a result of this change in status, Mr. Stackpole was very careful to identify himself only as an investment consultant.

*Paragraph 83*

Mr. Stackpole is unable to pay any fine. As noted by the Presentence Report, Mr. Stackpole has been incarcerated for some time. He is also liable for several other judgments. Everything he had is gone. Therefore, there is no possibility that Mr. Stackpole can pay any type of fine or other associated costs.

*Paragraph 101*

The Presentence Report uses the mail fraud counts as the "greater adjusted offense level." If Steven Stackpole's objections to the vulnerable victim enhancement are sustained, then the money laundering counts will have a higher adjusted offense level and the money laundering guidelines will become the "greater adjusted offense level." The money laundering guidelines will then drive the sentencing.

Mr. William Pool
PSR Objections for R. Steven Stackpole
March 9, 2001
Page 10

If the money laundering guidelines are used as the "greater adjusted offense level," then Steven Stackpole must object to the Presentence Report's failure to identify a possible ground for departure. In United States v. Smith, 186 F.3d 290 (3rd Cir. 1999) and United States v. Bockius, 228 F.3d 305 (3rd Cir. 2000) the Third Circuit Court of Appeals found that a district court must make a determination of whether the money laundering conduct was minimal or incidental to the underlying crime and whether the money laundering conduct was separate from the underlying crime and intended to make funds appear legitimate or to funnel money into further criminal activity. Bockius, 228 F.3d at 313.

In the matter of Steven Stackpole, the money laundering was minimal and merely incidental to the underlying crime. Mr. Stackpole was convicted of money laundering for (1) sending money to CPT who performed a valuable record keeping service (trial testimony indicated that the record keeping services performed by CPT were extraordinary and well worth the money paid, and, (2) paying finders' fees back to funeral directors who demanded such compensation. These transfers of funds by Mr. Stackpole were part of the underlying fraud. These actions were not separate from the fraud, but rather necessary to complete the fraud.

In United States v. Smith, supra, the Third Circuit Court of Appeals defined the general "choice of guideline" decision as having two parts. First, a sentencing court must determine whether the conduct being punished is "atypical" to the conduct usually punished by the statute of conviction. Second, if the conduct is "atypical" then the sentencing court must determine which guideline is more appropriate.

The United States Sentencing Commission has described the heartland conduct at which U.S.S.G. § 2S1.1 is targeted as: (1) situations in which the laundered funds derived from serious underlying criminal conduct such as significant drug trafficking operations or organized crime; and (2) situation in which the financial transaction was separate from the underlying crime **and** was undertaken to either; (a) make it appear the funds were legitimate; or (b) promote additional criminal conduct by reinvesting the proceeds in additional conduct. United States Sentencing Commission, Report to the Congress: Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Report at 4 (September 18, 1977).

Mr. William Pool
PSR Objections for R. Steven Stackpole
March 9, 2001
Page 11


Mr. Stackpole's money laundering conduct is "atypical" and outside the heartland. The money laundering was an incidental part of the fraud. Sentencing Mr. Stackpole under the money laundering guidelines would ". . . let the tail wag the dog." Smith, 186 F.3d at 300. Consequently, Mr. Stackpole must object because the Presentence Report has not identified this ground for possible departure.

Thank you for your kind consideration of this matter.

Sincerely,

Thomas A. Thornton
Asst. Federal Public Defender

TAT/rml
Attachment
cc:   Kim D. Daniel, AUSA
      R. Steven Stackpole